## THE ARCHIE CROSSMAN.

(District Court, E. D. New York. June 5, 1922.)

**Navigable waters ⊜═20(8)—Towage ⊜═11(7, 11)—Tug and not drawbridge tender held responsible for injury to tow.**

A tug *held* liable for injury to a barge in tow alongside, which she allowed to sag against the pier of a drawbridge while waiting for opening of the draw, the lines between the tug and tow having parted, owing to insufficiency of the lines or improper fastening of the same, thus allowing the barge to be carried by the tide against the draw; no fault being chargeable to either the barge or bridge tender.

In Admiralty. Suit by M. & J. Tracy, Inc., against the steam tug Archie Crossman, the Tice Towing Line, claimant, with the Director General of Railroads impleaded. Decree for libelant against the Archie Crossman. Petition against the Director General dismissed.

Macklin, Brown, Purdy & Van Wyck, of New York City, for libelant.

Park & Mattison, of New York City, for Tice Towing Line.

J. E. Morrissey, of New York City, for respondent.

CHATFIELD, District Judge. On the afternoon of July 30, 1918, at about 1:30 o'clock, the tug Archie Crossman was proceeding up the Hackensack river with a loaded coal boat, the Cape Best, on her port side. The so-called turnpike bridge, next south of the Lackawanna Railroad bridge, was opened to allow the tug to pass. Just after she cleared the center pier of the bridge, a signal of four whistles was blown by the Crossman to the Lackawanna bridge, for the opening of the Lackawanna draw. The distance from this point to the draw is

from 1,200 to 1,500 feet. The Lackawanna bridge tender immediately blew two whistles, indicating that the bridge could not be opened. It appears that the bridge tender is unable to operate the drawbridge until a locking device is released from a tower some 2,500 feet from the end of the bridge, where derailing devices and signals are set against approaching trains before the bridge can be opened. The bridge tender has to signal to the tower his desire to open the bridge, and get permission, through the setting of the signals against trains and the releasing of the bridge-locking device.

According to the testimony, this interchange of signals and the opening of the bridge occupies a space of about a minute. On the day in question the bridge tender had just received notice that a light engine was approaching, and he therefore immediately answered the signal of the Crossman, which thus promptly learned that the bridge would not be opened. The situation was aggravated, however, by the fact that a west-bound passenger train was following the light engine, and the bridge tender was unable to get a release of his bridge and to open the draw until the passenger train had passed and gotten out of the way, so that the tower could set the signals for the bridge to be opened.

In the meantime the tide, which was strongly flood, carried the Crossman and her barge against the bridge. At this drawbridge the channel, upon the west side of the center pier, is used for the passage of vessels with the flood tide, and the Crossman, when she observed that the bridge was not going to open, attempted to allow the barge to sag gently against the center pier, in order to hang there until the bridge could open. The contact was harder than expected, and the head line from the tug to the barge parted. The tide began to separate the bow of the tug and the bow of the tow, swinging them around into the space into which the draw of the bridge then began to swing open. In order to avoid greater accident, the stern line between the tug and the barge was cut, thus permitting the tug to back clear of the bridge, while the barge drifted under the bridge, which was then being closed by the bridge tender in an attempt to give the barge as much clearance as possible. The plate or wedge upon which the end of the draw rests upon the shore side, extends below the general level of the draw a slight distance. The roof of the cabin upon the barge caught this projection before the draw was entirely closed, and as the barge continued under the influence of the tide, damage was caused for which the action is brought. After the barge passed through the draw, the bridge was again opened, the tug went through, again took the barge in tow, and proceeded on her way.

Action was brought against the tug, which impleaded the Director General, and it is alleged on behalf of the claimant that the railroad should have provided a helper tug to assist vessels when the bridge could not be opened, and that those in charge of the bridge failed to open the bridge promptly, or to indicate by some alarm signal, such as a red flag, that the bridge was not ultimately going to open.

It is apparent from the testimony that the bridge tender acted as promptly as he could. His signal to the Crossman was to the effect that the bridge would not open, and inasmuch as the Crossman in-

tended to drift along with the tide and to rest against the center pier, in case the bridge did not open, it is impossible to find that an alarm or danger signal from the bridge would have made any difference under the circumstances.

No fault can be urged, because the bridge was opened as soon as possible, even though the accident might have been averted, if the bridge had remained closed. The bridge tender could not anticipate that the lines between the Crossman and the barge would part when the barge struck the center pier. The bridge attempted to open as rapidly as possible, and the effort of the bridge tender to again close the bridge, so as to allow room for the barge to pass under, was helpful, and not the basis of a charge of negligence, even though the tender did not succeed in entirely swinging the bridge shut, so as to give the barge the greatest possible clearance before the barge came in contact with the bridge.

The rules established by the Director General of Railroads provide that a bridge used exclusively for United States mail, passenger, and express trains need not be opened for any vessel reaching the draw within five minutes before the scheduled arrival of any such train, unless the tender has notice that the train is more than five minutes late. At such bridges a tug is to be stationed to control and aid in the passage of vessels. But this bridge is not within the rule.

It is said in the testimony that at one of the bridges across the Hackensack river there is such an auxiliary tug, due to the presence of a second bridge within 300 feet. The Crossman knew that no such tug was stationed at this bridge. She had sufficient power to control herself and her barge within the space between the turnpike bridge and the Lackawanna bridge, and in fact sometimes landed barges under such conditions at the municipal pier on the east side of the river between these bridges. The bridge tender testified that on the day in question, he was unable to tell, until he received a signal from the tug, whether the barge was to be delivered up the river beyond his bridge or at this pier.

While, under the circumstances, no fault can be charged against the bridge for any such reason, evidently no damage would have resulted if the fastening between the Crossman and the barge had not broken. There is no allegation and no evidence that the barge was injured by merely striking the center pier of the bridge. In the absence of any testimony showing that the weakness in fastening the barge to the tug was the fault of the barge in any way, the tug must be held responsible both for the lines used and for the sufficiency of the fastening, when it became apparent that contact with the bridge was necessary. The tug was bound to choose between holding back at such a point that the barge could be kept from contact with the bridge, or taking care of the barge when using the center pier of the bridge as a buffer or temporary landing place while waiting for the bridge to open.

No fault has been shown on the part of the libelant, and he should recover for the damages to the barge against the Crossman, while the petition impleading the Director General of Railroads should be dismissed.